Patrick W. Martin (Texas Bar No. 24086371)
Email: patrick.martin@chamberlainlaw.com
Jose Anuar Estefan Davila (Bar No. 330350)
Email: anuar.estefan@chamberlainlaw.com
Jaime Vasquez (Texas Bar No. 24066235)
Email: jaime.vasquez@chamberlainlaw.com
Leo Unzeitig (Texas Bar No. 24098534)
Email: leo.unzeitig@chamberlainlaw.com
CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, P.C.
112 E Pecan St., Suite 1450
San Antonio, Texas 78204
Telephone: (210) 253-8383
Facsimile: (210) 253-8384

Attorneys for Plaintiffs Alberto and Estela Aroeste

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| ALBERTO AROESTE,<br>ESTELA AROESTE,<br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>Defendant.<br>______________________________<br>UNITED STATES OF AMERCA,<br>Counterclaim Plaintiff,<br><br>v.<br><br>ALBERTO AROESTE,<br>ESTELA AROESTE,<br>Counterclaim Defendants.<br>______________________________ | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 22-CV-682-AJB-KSC<br><br>**ALBERTO AROESTE'S MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

**TABLE OF CONTENTS** .......... **2**

**TABLE OF AUTHORITIES** .......... **3**

**BACKGROUND** .......... **4**

I. Alberto and Estela Aroestes' Background .......... 4

II. The Aroestes' Real Estate .......... 5

III. The Aroestes' Residency Status .......... 5

IV. Travel, Lifestyle, and Social Ties .......... 6

V. Tax Returns and Audit .......... 7

**DISCUSSION** .......... **8**

I. Article 4 of the U.S.-Mexico Tax Treaty -- The "Tie-Breaker Test" .......... 9

II. Alberto's Resident Status .......... 10

III. Test One: Alberto's Permanent Home is in Mexico .......... 11

IV. Test Two: Alberto's Center of Vital Interests is in Mexico .......... 13

V. Test Three: Alberto's Habitual Abode is in Mexico .......... 16

**CONCLUSION** .......... **16**

# TABLE OF AUTHORITIES

## Cases

Bittner v United States, 598 U.S. __ 143 S.Ct. 713, 2023 WL 2247233 (Feb 28, 2023) ....... 6

Crow v. Commissioner, 85 T.C. 376, 380 (1985) ..... 11

Elliot v. The Queen, 2010-898(IT)G ..... 11

Maximov v. United States, 299 F.2d 565 (2d Cir. 1962) ..... 11

North West Life Assur. Co. of Canada v. Commissioner, 197 T.C. 363 (1996) ..... 11

Podd v. Commissioner, T.C. Memo. 1998-418 ..... 10, 11, 13

Sumitomo Shoji American, Inc. v. Avagliano, 457 U.S. 176, 185 (1982) ..... 11

Taisei Fire and Marine Ins. Co., Ltd. v. Commissioner, 104 T.C. 535, 548 (1995) ..... 11

## Statutes

26 U.S.C. § 7701 ..... 4

26 U.S.C. § 7701(b) ..... 4

26 U.S.C. § 7701(b)(6) ..... 17

26 U.S.C. § 894(a) ..... 17

26 U.S.C. § 7701(a)(30) ..... 10

## Other Authorities

Art. IV, par. 1 ..... 10

Art. IV, par. 2 ..... 10, 11

Mexican Fiscal Code, Art. 9 ..... 10

OECD Model Treaty Commentary ..... 12, 13, 16

Treasury Department Technical Explanation of U.S.-Mexico Income Tax Treaty ........ 11, 12

## Regulations

31 C.F.R. § 1010.350 ..... 4, 17

Treas. Reg. 301.7701(b)-1(b)(1) ..... 10

Over seven years ago, the IRS began an audit of the Aroestes who reside in Mexico. The IRS ultimately determined that Alberto Aroeste was a resident of the United States under 26 U.S.C. § 7701.

That singular determination resulted in over $3 million dollars in penalties (which includes the $20,000 in FBAR penalties before this Court and less than $60,000 in income tax assessed).

This case can thus be reduced to a single dispositive issue: whether Alberto Aroeste was a resident of the United States under 26 U.S.C. § 7701(b) (subjecting him to FBAR filing requirements under 31 C.F.R. § 1010.350) or whether he ceased to be a resident of the United States by application of the U.S.-Mexico tax treaty and was instead treated as a resident of Mexico where he has filed Mexican resident income tax returns throughout his lifetime.

## BACKGROUND

I. Alberto and Estela Aroestes' Background

Alberto Aroeste was born in Mexico and has lived there all his life. Stip. ¶ 14; Dec. ¶ 2, 3.[1] He went to school in Mexico and attended and graduated from college in Mexico. Stip. ¶ 15. He married Estela Aroeste in Mexico and they have remained married for over 60 years. Stip. ¶ 17; Dec. ¶ 5. They have three children who were all raised in Mexico. Dec. ¶ 6, 15, 16. Their two daughters continue to reside in Mexico and their son resides in California. Dec. ¶ 7.

Alberto's Mexican education and professional background focused on finance. Stip. ¶ 16. Alberto worked in Mexico for Continental Can Company for 27 years spanning from 1965 to 1992. Stip. ¶ 18; Dec. ¶ 9. Continental Can was an American producer of metal containers and packaging. Stip. ¶ 19; Dec. ¶ 10. Alberto was an executive in the Mexican

[1] Citations to "Stip." are to the Joint Stipulations of Fact filed on August 9, 2023 and found at Dkt. #69. Citations to "Dec." are to the declaration executed by Alberto Aroeste and attached to this memorandum.

division and ultimately became the managing director for 15 years prior to his retirement in 1992. Stip. ¶ 20; Dec. ¶ 11.

Alberto had been retired from Continental Can Company for a period of time before he was approached to work for several more years for another Mexican corporation where he was managing director for the company's manufacturing facilities. Stip. ¶ 21; Dec. ¶ 12. Alberto retired again prior to 2012. Stip. ¶ 22; Dec. ¶ 13. He resides in Mexico where he manages his real estate and financial, banking, and investment accounts. Stip. ¶ 22 and 52; Dec. ¶ 14.

II. The Aroestes' Real Estate

Alberto and Estela Aroeste have lived in the same house in Mexico City for over 50 years. Stip. ¶ 23; Dec. ¶ 15. The same home in Mexico City is where the Aroestes raised their three children. Stip. ¶ 24; Dec. ¶ 16. It is where they keep all their important items, personal effects, and objects of sentimental value. Dec. ¶ 17 and 24.

The Aroestes also own a simple two-bedroom country house in the State of Morelos, Mexico. Stip. ¶ 25; Dec. ¶ 18. They purchased the country house in 1994 and continued to own and enjoy it during the years at issue. Stip. ¶ 25–26; Dec. ¶ 19. No one lives in the country house full-time. Stip. ¶ 27; Dec. ¶ 20.

Alberto and Estela Aroeste also own a condominium in Florida that they purchased in 1980. Stip. ¶ 28; Dec. ¶ 21. They use the condominium only for vacation and relaxation. Stip. ¶ 29; Dec. ¶ 22. No one lives in the condominium full-time. Stip. ¶ 30. The most time the Aroestes have ever stayed in the Florida condominium in any single stretch is maybe three weeks to a month. Stip. ¶ 31. The Aroestes' children occasionally use the Florida condominium. Stip. ¶ 32.

III. The Aroestes' Residency Status

Alberto was encouraged sometime in the 1980s to apply for lawful permanent residency status in the U.S. (i.e., a "green card") to facilitate his travel to the United States and become eligible to participate in Continental Can Company's fringe benefit plan. Stip. ¶ 36; Dec. ¶ 32.

Alberto has never been a U.S. Citizen. Stip. ¶ 37; Dec. ¶ 33. Alberto has always intended to be a resident of Mexico and has never intended for his domicile or home to be in the United States. Stip. ¶ 38; Dec. ¶ 34. Alberto has never intended to change his domicile to the United States. Stip. ¶ 39; Dec. ¶ 34.

Estela Aroeste became a naturalized U.S. citizen on November 8, 2011 and was a citizen during the years at issue. Stip. ¶ 40. The parties agreed that because Estela was a citizen and thus a United States person, she had a requirement to file FBARs during the years at issue. The parties have also agreed that the penalty for Estela should have been smaller than the amount assessed by the IRS given the Supreme Court's holding in Bittner v United States, 598 U.S. __ 143 S.Ct. 713, 2023 WL 2247233 (Feb 28, 2023). The parties have resolved Estela Aroeste's case where she paid $3,533.56 and the only case remaining before this Court relates to Alberto Aroeste.

IV. Travel, Lifestyle, and Social Ties

During the years at issue, the Aroestes owned several cars, all located in Mexico. Stip. ¶ 41; Dec. ¶ 30. They did not own any cars in the United States. Dec. ¶ 30. When they travel to the United States, they rent a car. Dec. ¶ 31.

Alberto Aroeste votes in Mexico. Stip. ¶ 42; Dec. ¶ 35. Alberto Aroeste is not eligible to vote, and does not vote, in the United States. Stip. ¶ 42, 43; Dec. ¶ 36.

Alberto's primary care doctor is in Mexico City. Dec. ¶ 26. His dentist (who has treated him since the 1970s) is in Mexico City. Dec. ¶ 27. His health insurance is provided for in Mexico. Dec. ¶ 28. His cell phone plan is contracted for in Mexico. Dec. ¶ 29. The majority of his credit cards and bank accounts are in Mexico. Dec. ¶ 40.

Alberto's social ties are in Mexico. Dec. ¶ 37. Alberto started the Mexican Institute of Financial Executives in Mexico and remains a member and past president. Stip. ¶ 44 and 45. He has belonged to the organization since its inception and meets once a month with the vice president. Stip. ¶ 46. Most of Alberto's friends are in Mexico. Dec. ¶ 38.

When Alberto travels, including during the years at issue, he purchases round-trip plane tickets "departing from and returning to" Mexico City. Dec. ¶ 41.

The revenue agent in this case prepared an extensive analysis of the Aroestes' relative presence in the United States and Mexico from 2007 to 2017. Stip. ¶ 47. That analysis is found at Exhibit J of the stipulations. The analysis was prepared using documents from the Aroestes' records, stamps in their passports, U.S. Customs and Immigration entry/exit data, and records received in response to summonses to 16 independent financial institutions, credit cards companies, attorneys, CPAs, and other businesses. Stip. ¶ 48. The analysis shows that Alberto Aroeste was in the United States no more than 67 days in 2012 and 57 days in 2013. Stated as a percentage, Alberto spent no more than 22% of his time in the United States in 2012 and 19% of his time in the United States in 2013. Stip. ¶ 49.

V. <u>Tax Returns and Audit</u>

Alberto and Estela have always filed their Mexican tax returns as residents of Mexico. Stip. ¶ 53, 54, and 55. Exhibit K in the stipulations is a Certification of Tax Residency dated August 5, 2020 showing that since at least 1992, Alberto has been a certified resident of Mexico for tax purposes. Stip. ¶ 53. The Aroestes hire an accounting firm in Mexico to prepare their Mexican tax returns. Stip. ¶ 56.

With respect to their United States tax returns, Alberto and Estela were advised by prior counsel to apply for and enter into the Offshore Voluntary Disclosure Program, which they did on November 26, 2014. Stip. ¶ 57. They received clearance to enter into the program on December 31, 2014. Stip. ¶ 58.

On January 22, 2016, new counsel for the Aroestes notified the IRS that the Aroestes wished to opt-out of the Offshore Voluntary Disclosure Program. Stip. ¶ 59. The letter explained that they had received better, more technical and comprehensive legal advice about U.S. law and the tax consequences to them as a result of their status as lifelong citizens and residents of Mexico. Shortly thereafter (around March 2016), the IRS opened an examination and the case was assigned to an agent. In August 2016, the IRS notified the Aroestes that it would be implementing opt-out procedures. Stip. ¶ 60. Two months later, the IRS sent another letter seeking confirmation that the Aroestes intended to opt-out and requested a response within 20 days explaining why. Stip. ¶ 62.

The Aroestes sent a detailed response highlighting several previous letters explaining why the Aroestes were opting out. Stip. ¶ 63. The Aroestes also submitted corrected returns for the 2008 through 2014 tax years reflecting the application of the law provided under the U.S.-Mexico tax treaty. Stip. ¶ 64.

The IRS acknowledged receiving the corrected returns and stated that at least one of them was processed by the IRS campus. Stip. ¶ 65. The IRS ultimately processed the 2008 and 2011 corrected returns reflecting treaty law. Stip. ¶ 66. However, the IRS examination team later directed the service center to reverse the processed returns and reinstate the original returns. Stip. ¶ 67.

Alberto timely filed original tax returns for the tax years 2015 through 2021 reflecting the application of the treaty law and the IRS has processed and accepted those returns. Stip. ¶ 68–69.

The IRS examination for the 2006 through 2014 tax years continued for over 4 years from March 2016 until April 2020 when the IRS finally assessed the FBAR penalties at issue. The IRS also assessed over $3 million in other information return penalties and continues to add additional penalties.

Alberto paid a small portion of the FBAR penalties and filed an illegal exaction claim under the Little Tucker Act. The Government counterclaimed to secure a judgment for a portion of the balance that the IRS assessed.[2]

## DISCUSSION

The issue in this case boils down to whether Alberto Aroeste is a "United States person" subject to FBAR filing requirements. See 31 C.F.R. § 1010.350. The government

[2] The Government actually filed a suit to reduce the entire FBAR balance to judgment in the Middle District of Florida (Dkt. 8:22-cv-1067) prior to the Aroestes' suit in this Court, but the Government had not been able to perfect service on the Aroestes because they were in Mexico. The parties negotiated to pursue their claims in this Court rather than in the Middle District of Florida and the government thus dismissed its Florida suit and asserted counter-claims in this Court.

argues he is by virtue of his green card and that the U.S.-Mexico tax treaty has no place in this case. The Court, however, correctly noted in its February 13, 2023 order that through an interconnected web of cross-referenced statutes and regulations, tax treaties can provide "a potential escape hatch that excuses certain 'United States persons' from filing FBARs." Dkt. 42 at 6. The Court further noted that because "the United States and Mexico indisputably have a tax treaty, Mr. Aroeste would ***not*** be a lawful permanent resident within the meaning of 26 U.S.C. section 7701(b)(6) ***if*** he commenced to be treated as a resident of Mexico under the Treaty (with additional caveats enumerated in the statute); which might in turn have excused him from the requirement to file FBARs as a 'United States person'." Dkt. 42 at 7.

Thus, the dispositive issue in this case is whether Alberto Aroeste commenced to be treated as a resident of Mexico under the treaty, pulling him through the escape hatch of United States residency and "United States person" status, and thus exempted him from FBAR filing requirements and any resulting penalties for nonfiling.

I. <u>Article 4 of the U.S.-Mexico Tax Treaty -- The "Tie-Breaker Test"</u>

We start by looking at Article 4 of the U.S.-Mexico treaty. It contains "tie-breaker rules" that determine an individual's residence for tax and certain information return filing requirements. At a high level, the test is intended to limit tax and reporting obligations for individuals the federal government describes as so-called "dual resident" taxpayers to the country in which they have a closer connection. The tie-breaker test starts as follows (and cascades to subsequent tests if the first several tests offer no clear result):

> 2. Where . . . an individual is a resident of both Contracting States, then his residence *shall* be determined as follows:
>
> a) he *shall* be deemed to be a resident of the State in which he has a permanent home available to him; if he has a permanent home available to him in both Contracting States, he *shall* be deemed to be a resident of the State which his personal and economic relations are closer (center of vital interests);
>
> b) if the State in which he has his center of vital interests cannot be determined, or if he does not have a permanent home

> available to him in either State, he *shall* be deemed to be a resident of the State in which he has an habitual abode . . . .

Article 4, Par 2. [Emphasis added].

II. Alberto's Resident Status

The first question is whether Alberto Aroeste is "a resident of both Contracting States". Art. IV, par. 2; see also Podd v. Commissioner, T.C. Memo. 1998-418 *2–*3. In other words, we ask first whether there is a tie that needs to be broken. The treaty says that taxpayers are residents of a contracting state if, under the laws of that state, the person "is liable to tax therein by reason of his domicile, residence, place of management, place of incorporation, or any other criterion of a similar nature." Art. IV, par. 1; see also Podd v. Commissioner, T.C. Memo. 1998-418 *2–*3. The Government argues that during the years at issue, Alberto was a resident of the United States for tax purposes by virtue of his green card even though he was not residing in the United States. See 26 U.S.C. 7701(a)(30), (b)(1)(A)(i); Treas. Reg. 301.7701(b)-1(b)(1). But Alberto was a resident of Mexico for tax purposes. He filed his Mexican tax returns as a resident of Mexico and he also has a Certification of Tax Residency dated August 5, 2020 showing that since at least 1992, he has been a certified tax resident of Mexico. Stip. ¶ 53. Furthermore, he is a resident of Mexico under Mexican tax law because he had a dwelling in Mexico and more than 50% of his income in the calendar year was derived from Mexican sources. See Mexican Fiscal Code, Art. 9 (stating that under Mexican tax law, individuals that have homes in two countries are residents in Mexico for tax purposes if their center of vital interests is in Mexico which is deemed to occur when more than 50% of their income in a calendar year is derived from Mexican sources). Dec. ¶ 42. Thus, each country claims tax jurisdiction over Alberto Aroeste.

Because there is a tie (and Alberto would theoretically be subject to tax rules in both countries), the Article 4 tie-breaker test steps in to assign Alberto's residency to a single country (and ameliorate the harsh effect of potentially being subject to two countries' tax regimes). See Treasury Department Technical Explanation of U.S.-Mexico Income Tax

Treaty (explaining that when a person is a tax resident of both the United States and Mexico, Article 4 of the U.S.-Mexico treaty "provides a series of tests for ***assigning*** a single residence to an individual.") [Emphasis added.]

III. Test One: Alberto's Permanent Home is in Mexico

The first tie-breaker test says that when a person is a resident of both the United States and Mexico, he "shall be deemed to be a resident of the State in which he has a permanent home available to him". Art. IV, par. 2.

The term "permanent home" is not defined in the treaty. We thus turn to the unique rules for construing treaty terms. Most important is that Courts are generally required to give effect to the *intent* of the treaty parties when the treaty was negotiated. Sumitomo Shoji American, Inc. v. Avagliano, 457 U.S. 176, 185 (1982); see also Crow v. Commissioner, 85 T.C. 376, 380 (1985); quoting Maximov v. United States, 299 F.2d 565 (2d Cir. 1962) ("The goal of treaty interpretation is 'to give the specific words . . . a meaning consistent with the genuine shared expectations of the contracting parties.'"). Courts typically go beyond the treaty's literal language and "examine the Treaty's 'purpose, history and context.'" Taisei Fire and Marine Ins. Co., Ltd. v. Commissioner, 104 T.C. 535, 548 (1995).

Cases interpreting tax treaty language often rely on commentary related to the Model Treaty drafted by the Organization for Economic Cooperation and Development (OECD). Podd v. Commissioner, T.C. Memo. 1998-418 (U.S. Tax Court relying on OECD commentary in construing the Article 4 tie-breaker test under the U.S.-Canada tax treaty); Taisei Fire and Marine Ins. Co., Ltd. v. Commissioner, 104 T.C. at 548 (U.S. Tax Court relying on OECD commentary in construing Article 9 of the U.S.-Japan tax treaty); North West Life Assur. Co. of Canada v. Commissioner, 197 T.C. 363 (1996); Elliot v. The Queen, 2010-898(IT)G (Canadian Tax Court relying on OECD commentary in construing Article 4 tie-breaker test under the U.S.-Canada tax treaty). This is because tax treaties (including the U.S.-Mexico tax treaty) are often based on the OECD Model Treaty. See Podd v. Commissioner, T.C. Memo. 1998-418 at *4; Treasury Department Technical Explanation of

U.S.-Mexico Income Tax Treaty (stating that the U.S.-Mexico treaty tie-breaker "rules come from the OECD Model").

That leads us to the OECD commentary to Article 4 explaining that the term "permanent home" is one in which

> the individual has arranged to have the dwelling available to him at all times continuously, and not occasionally for the purpose of a stay which, owing to the reasons for it, is necessarily of short duration (travel for pleasure, business travel, educational travel, attending a course at a school, etc.).

See OECD Model Treaty Commentary at ¶ 13, pg. 87.

Here, Alberto Aroeste has homes in both the United States and Mexico. All three homes were always available to him. However, only his home in Mexico City is his "permanent home". The condominium in Florida and the country house in Morelos, Mexico are used for short durations and are owned solely for vacation and pleasure. During the years at issue, Alberto spent only a short duration in the Florida condominium, always during the holidays. He keeps none of his personal and important items in Florida. He paid a company called Miramar Services to collect mail received at the Florida condominium and forward it to his residence in Mexico City. Stip. ¶ 33. Miramar also paid certain bills on the Aroestes' behalf. Stip. ¶ 34. Indeed Miramar describes itself as "a bill paying service for foreign nationals who generally live outside the U.S. but who maintain vacation home/second home in the States for a monthly fee, Miramar Services pays these bills as directed by client. Miramar also picks up or receives mail addressed to the client at their address and forwards such mail to the client or holds mail until the client returns to the States and picks up the mail in person." Stip. ¶ 35.

Thus, under the first tie-breaker test, Alberto has only a single "permanent home" available to him. That home is in Mexico and it is the primary home available to him continuously. The reason for owning the Florida condominium is for travel and pleasure and thus any stay there "is necessarily of short duration." His physician, his dentist, his family, his friends, and the bulk of his "stuff" are in Mexico City where he spends the majority of his time. Anything that is mailed to his Florida condominium is forwarded to

his Mexico City residence. Because Alberto's only "permanent home" is in Mexico, the first tie-breaker test provides that Alberto "shall be deemed to be a resident of [Mexico]".

IV. Test Two: Alberto's Center of Vital Interests is in Mexico

To the extent that the Court determines that the Mexico City residence and the Florida condominium were both "permanent homes" available to Alberto within the meaning of the treaty, we turn to the next tie-breaker test providing that "he shall be deemed a resident of the State in which his personal and economic relations are closer (center of vital interests)". The treaty provides no further elaboration on this "center of vital interests test", but Courts have again turned to the OECD commentary which explains the center of vital interest test as follows:

> If the individual has a permanent home in both Contracting States, it is necessary to look at the facts in order to ascertain with which of the two States his personal and economic relations are closer. Thus regard will be had to his family and social relations, his occupations, his political, cultural or other activities, his place of business, the place from which he administers his property, etc. The circumstances must be examined as a whole, but it is nevertheless obvious that considerations based on the personal acts of the individual must receive special attention. If a person who has a home in one State sets up a second in the other State while retaining the first, the fact that he retains the first in the environment where he has always lived, where he has worked, and where he has his family and possessions, can, together with other elements, go to demonstrate that he has retained his centre of vital interests in the first State.

See OECD Model Treaty Commentary at ¶ 15, pg. 87; see also Podd v. Commissioner, T.C. Memo. 1998-418 (relying on the OECD commentary in construing the center of vital interest test).

Here, Alberto's center of vital interests lies in Mexico. He was born in Mexico. He went to school in Mexico. He raised his children in Mexico. He and his wife live in Mexico. He worked in Mexico. He retired in Mexico. He is a member of social organizations in Mexico. Most of his friends are in Mexico. He votes in Mexico. His primary residence is in Mexico. His cars are in Mexico. His personal belongings are in

Mexico. His doctors are in Mexico. His dentist is in Mexico. His health insurance is in Mexico. His cell phone carrier is in Mexico. And he receives all his mail in Mexico.

Alberto thus meets the center of vital interests test because his family and social relations are in Mexico, his occupations were always in Mexico, his political, cultural, and other social activities are centered in Mexico, and he administers his property, manages his healthcare, and maintains his customary living obligations in Mexico.

But it's not just Alberto's personal and economic ties to Mexico that show it's his center of vital interests, his physical presence does as well.

During the IRS audit, the revenue agent conducted her own independent analysis of Alberto's relative presence in Mexico and the United States. She used documents from the Aroestes' records, stamps in their passports, U.S. Customs and Immigration entry/exit data, and records received in response to summonses to 16 independent financial institutions, credit cards companies, attorneys, CPAs, and other businesses. The results show that he spent **over 75%** of his days during the years at issue in Mexico.

Moreover, of the time he was in the United States, especially Florida, it was always for vacation and it was usually during the holidays. With respect to both years at issue, he stayed in the Florida condominium during the Christmas and New Year's holidays (arriving in Florida mid-December and returning to Mexico City in early January). Those were the only times he was at the Florida condominium.

His other trips to the United States were for an Alaska Cruise, visiting his son and grandchildren in California, and a vacation to New England. That's it.

For a visual perspective, we provide the following charts showing Alberto Aroeste's relative presence in the United States and Mexico during the years at issue.







Alberto's presence in Mexico dominates his relative presence to the United States. All of his social and economic ties as well as his physical presence are in Mexico. Alberto's center of vital interests is in Mexico, not the United States.

Moreover, we highlight the portion of the OECD commentary stating when "a person has a home in one State and sets up a second in the other State while retaining the first in the environment where he has always lived, where he has always worked, and where he has

his family and possessions," that can demonstrate he retained his center of vital interests in the first state. Here, Alberto has lived in the same home in Mexico City for over 50 years. When he and Estela purchased the Florida condominium in the 1980s, he maintained his Mexico City residence "in the environment where he [had] always lived, where he [had] always worked, and where he [had] his family and possessions." Alberto thus retained his center of vital interests in Mexico even though he purchased a vacation property in Florida.

V. Test Three: Alberto's Habitual Abode is in Mexico

To the extent that the Court is unable to determine Alberto's center of vital interests, Article 4 directs us to the next tie-breaker which says that Alberto "shall be deemed to be a resident of the State in which he has an habitual abode". The commentary to that provision explains that

> In . . . the case where the individual has a permanent home available to him in both States, the fact of having an habitual abode in one State rather than in the other appears therefore as the circumstance which, in case of doubt as to where the individual has his centre of vital interests, tips the balance towards the State where he stays more frequently.

See OECD Model Treaty Commentary at ¶ 13, pg. 87. In other words, where Alberto spends more time is where he maintains an habitual abode.

Here, Alberto spent 78% of his time in Mexico in 2012 and 81% of his time in Mexico in 2013. Stip. ¶ 49. Thus, because he spent more time in Mexico than the United States, Mexico was his habitual abode for purposes of the treaty tie-breaker rules.

## CONCLUSION

This case should be straightforward. Alberto Aroeste is Mexican and his lifestyle confirms that. Under the treaty, he should be treated as a resident of Mexico and not the United States.

The IRS disagrees. It believes that the provisions of the treaty are subject to IRS discretion and that the agency can look to Alberto's green card and use that to conclude Alberto is All-American. The Government made that clear when it said "What is relevant to whether Mr. Aroeste was a 'U.S. person" required to file FBARs is rather simple: his

immigration status. If Mr. Aroeste is a lawful permanent resident, the inquiry ceases." Dkt. 36 at 10.

That cannot be the case. And the Court confirmed as much in its February 13, 2023 order. Dkt. 42. The very purpose of a tax treaty is to limit the ability of two contracting nations to simultaneously treat a person as a resident. The OECD commentary recognizes the fundamental fact that there are instances where "both states claim that [a taxpayer] is fully liable to tax." OECD Commentary ¶ 6, pg 84. When that happens, the "conflict ***<u>has</u>*** to be resolved by the [treaty]". <u>Id.</u> [Emphasis added]. It's not subject to the discretion of the taxpayer or the state and the Code itself expressly states that the provisions of Title 26 "shall be applied to any taxpayer with due regard to any treaty obligation of the United States which applies to such taxpayer." 26 U.S.C. § 894(a).

The FBAR regulations adopted the tax Code's definition for residency and made no qualification for treaty law or the flush language in 26 U.S.C. § 7701(b)(6). Thus, if Alberto "ceases" to be a resident of the United States and "commences" to be treated as a resident of Mexico under the provisions of the treaty, the IRS must honor that. Comity and respect among nations demands it.

We therefore request that the Court confirm what we have known for many years (1) both the United States and Mexico lay claim to Alberto Aroeste as a resident, (2) under Article 4 of the U.S.-Mexico tax treaty he "shall be deemed" to be a resident of Mexico because that is the only country in which he has a permanent home (or alternatively because that is the country with which his personal and economic relations are closer and in which he has an habitual abode), (3) he was thus not a "United States person" required to file FBARs as defined by cross reference from 31 C.F.R. § 1010.350 because the treaty caused him to cease to be a United States resident.

In other words, Alberto was pulled through the escape hatch; by simple application of the law, the law set forth in an international treaty.

Respectfully submitted,

CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, P.C.

By: /s/ *Patrick W. Martin*
Patrick W. Martin
State Bar No. TX24086371
patrick.martin@chamberlainlaw.com

Jaime Vasquez
State Bar No. TX24066235
jaime.vasquez@chamberlainlaw.com

Jose Anuar Estefan Davila
State Bar No. 330350
Anuar.estefan@chamberlainlaw.com

Leo Unzeitig
State Bar No. TX24098534
leo.unzeitig@chamberlainlaw.com

112 East Pecan St., Suite 1450
San Antonio, Texas 78205
Telephone: (210) 507-6508
Facsimile: (210) 253-8384

**ATTORNEYS FOR PLAINTIFFS ALBERTO AND ESTELA AROESTE**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was forwarded to the following counsel of record by electronic service as indicated below.

Christina T. Lanier
Attorney, Tax Division
Department of Justice
P.O. Box 14198
Washington D.C. 20044
Christina.T.Lanier@usdoj.gov

Randy S. Grossman
United States Attorney
Southern District of California

*Attorneys for United States of America*

By: */s/ Patrick Martin*
Patrick W. Martin

30967835.v4