UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALBERTO AROESTE,<br><br>　　　　　　　　　Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>　　　　　　　　　Defendant.<br><br>UNITED STATES OF AMERICA,<br><br>　　　　　　Counterclaim Plaintiff,<br><br>v.<br><br>ALBERTO AROESTE,<br><br>　　　　　Counterclaim Defendant. | Case No.: 22-cv-00682-AJB-KSC<br><br>**ORDER:**<br><br>**(1) DENYING THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT; and**<br><br>**(2) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>**(Doc. Nos. 70, 71)** |

　　　Presently before the Court are cross-motions for summary judgment filed by Plaintiff and Counterclaim Defendant Alberto Aroeste, (Doc. No. 70), and Defendant and Counterclaim Plaintiff the United States of America (the "Government"), (Doc. No. 71). On November 13, 2023, the parties appeared before the Court for a hearing on their cross-motions for summary judgment. Upon consideration of the motions, the responses and replies thereto, the applicable law, the parties' oral arguments, the entire record herein, and for the reasons set forth below, the Court **DENIES** the Government's motion for summary

judgment and **GRANTS IN PART AND DENIES IN PART** Aroeste's motion for summary judgment.

## I.     BACKGROUND

Alberto Aroeste was born in Mexico and has lived there all his life. (Joint Stipulations of Fact ("Stip."), Doc. No. 69, ¶¶ 14–23.) He went to school and graduated from college in Mexico, and he and his wife have remained there for over 60 years. (*Id.* ¶ 17.) Aroeste worked in Mexico until he retired prior to 2012. (*Id.* ¶¶ 18, 20.) Moreover, he and his wife have lived in Mexico City for over 50 years. (*Id.* ¶ 23.) The Aroestes also own a condominium in Florida which they purchased in 1980, which is used for vacation and relaxation. (*Id.* ¶¶ 28, 29.) No one lives in the Florida condominium full-time. (*Id.* ¶ 30.) Aroeste has also always filed his Mexican tax returns as a resident of Mexico. (*Id.* ¶¶ 53–55.)

In 1984, Aroeste applied for lawful permanent residency status in the United States (i.e., a "green card"). (*Id.* ¶¶ 9, 10.) This status was never administratively or judicially revoked for the years at issue. (*Id.* ¶ 11.) His wife became a naturalized U.S. citizen on November 8, 2011 and was a citizen during the years at issue. (*Id.* ¶ 8.) The Parties agreed that because Mrs. Aroeste was a citizen and thus a United States person, she was required to file a Report of Foreign Bank and Financial Accounts ("FBAR") for the years at issue. (Doc. No. 70-1 at 6.) The Parties have thus resolved Mrs. Aroeste's case where she paid $3,533.56. (*Id.*)

In 2012 and 2013, Aroeste had a financial interest or signature authority over five accounts in Mexico, of which the aggregate balance exceeded $10,000 U.S. Dollars. (Stip. ¶¶ 1, 2.) With respect to their United States tax returns, for the 2012 and 2013 tax years, the Aroestes filed an individual income tax return as married filing jointly. (*Id.* ¶¶ 3, 4.) With this return, Aroeste did not submit a Form 8833, Treaty-Based Return Position Disclosure Under Section 6114 or 7701(b), raising Article 4 of the United States – Mexico Income Tax Convention, nor did he make a Section 6013(g) election. (*Id.*)

Aroeste was advised by prior counsel to apply for and enter in the Offshore

Voluntary Disclosure Program, which he did on November 26, 2014. (*Id.* ¶¶ 57–63.) He did not file an FBAR for either year at issue. (*Id.*)

On January 22, 2016, new counsel for the Aroestes notified the IRS that the Aroestes wished to opt out of the Offshore Voluntary Disclosure Program. (*Id.* ¶ 59.) The letter explained they had received more technical and comprehensive legal advice about U.S. law and the tax consequences to them as a result of their status as citizens and residents of Mexico. (Doc. No. 70-1 at 7.) Thereafter, around March 2016, the IRS opened an examination and the case was assigned to an agent. (*Id.*) After explaining to the IRS why they intended to opt out, the Aroestes also submitted amended returns for the 2008 through 2014 tax years. (*Id.* at 7–8.) Specifically, on October 2, 2016, the Aroestes submitted a purportedly corrected individual income tax return for tax year 2012 as married filing jointly. (Stip. ¶ 5.) With this return, Aroeste did not submit a Form 8833, Treaty-Based Return Position Disclosure Under Section 6114 or 7701(b), raising Article 4 of the United States – Mexico Income Tax Convention, nor did he make a Section 6013(g) election. (*Id.*) By the time Aroeste submitted this return, the audits into his U.S. income tax returns and FBAR compliance had already begun. (*Id.*) Thereafter, on October 12, 2016, Aroeste submitted a purportedly corrected individual tax return for tax years 2012 and 2013 as married filing separate. (*Id.* ¶¶ 6, 7.) With this return, he submitted Form 8833. (*Id.*)

Aroeste also timely filed original tax returns for tax years 2015 through 2021 reflecting the application of the Treaty law, which the IRS processed and accepted. (*Id.* ¶¶ 68, 69.)

On May 12, 2020, a delegate of the Secretary of the Treasury assessed $50,000 in FBAR penalties against Aroeste for 2012 and 2013, totaling $100,000.00. (Doc. No. 71-1 at 8–9.) On May 2, 2022, Aroeste paid $3,004 toward his outstanding FBAR penalties. (*Id.* at 9.) The Government asserts that as of August 9, 2023, Aroeste owes $21,851.76 for his outstanding FBAR penalties for 2012 and 2023. (*Id.*) Aroeste now sues the United States seeking to recoup the penalty payment of $3,004 and to discharge his liability for penalties still outstanding for the non-filing of a FBAR for the years 2012 and 2013 pursuant to 31

U.S.C. § 5321. (Complaint, Doc. No. 1, ¶ 9.) The United States counterclaims against Plaintiff to recover the balance of unpaid penalties totaling $21,851.76. (Doc. No. 11.)

## II.    LEGAL STANDARD

A court may grant summary judgment when it is demonstrated that there exists no genuine dispute as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The party seeking summary judgment bears the initial burden of informing a court of the basis for its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). If a moving party fails to carry its burden of production, then "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Id.* If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine dispute as to any material fact actually exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party cannot "rest upon the mere allegations or denials of the adverse party's pleading but must instead produce

1  evidence that sets forth specific facts showing that there is a genuine issue for trial." *See*
2  *Estate of Tucker*, 515 F.3d 1019, 1030 (9th Cir. 2008) (internal quotation marks,
3  alterations, and citation omitted).
4     The evidence of the opposing party is to be believed, and all reasonable inferences
5  that may be drawn from the facts placed before a court must be drawn in favor of the
6  opposing party. *See Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065 (9th Cir. 2003).
7  However, "[b]ald assertions that genuine issues of material fact exist are insufficient." *See*
8  *Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007); *see also Day v. Sears*
9  *Holdings Corp.*, 930 F. Supp. 2d 1146, 1159 (C.D. Cal. 2013) ("Conclusory, speculative
10 testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and
11 defeat summary judgment."). Further, a motion for summary judgment may not be defeated
12 by evidence that is "merely colorable, or is not significantly probative . . . ." *See Anderson*,
13 477 U.S. at 249–50 (citations omitted); *see also Hardage v. CBS Broad. Inc.*, 427 F.3d
14 1177, 1183 (9th Cir. 2006) (same). If the nonmoving party fails to produce evidence
15 sufficient to create a genuine dispute of material fact, the moving party is entitled to
16 summary judgment. *See Nissan Fire & Marine*, 210 F.3d at 1103.

17 **III.   DISCUSSION**

18    Because the cross-motions for summary judgment request adjudication of the same
19 issue and contain arguments common to both, the Court will address the motions together,
20 giving due merit to each motion. *See Schutza v. City of San Diego*, No.
21 313CV2992CABKSC, 2016 WL 11621283, at *2 (S.D. Cal. June 29, 2016).
22    Both Parties in their cross-motions for summary judgment assert the issue is whether
23 Aroeste was a "United States person," and thus required to file FBARs, for 2012 and 2013.
24 In his motion for summary judgment, Aroeste asserts he ceased to be a resident of the
25 United States by application of the United States-Mexico Income Tax Convention, also
26 named the "Convention between the Government of the United States of America and the
27 Government of the United Mexican States for the Avoidance of Double Taxation and the
28 Prevention of Fiscal Evasion with Respect to Taxes on Income" Mx.–U.S., Jan. 1, 1994

(the "Treaty"), and was instead treated as a resident of Mexico where he has filed Mexican resident income tax returns throughout his lifetime. (Doc. No. 70-1 at 4.) The Government contends it is entitled to summary judgment because Aroeste is a "United States person" and failed to assert this Treaty position until he was audited by the Internal Revenue Service ("IRS") years after he could legally claim that position. (Doc. No. 71-1 at 5.)

### A.   Whether Aroeste Is a "United States Person"

Federal law requires every United States person who has a financial interest in, or signature authority over, a foreign financial account to report that relationship annually to the IRS. 31 U.S.C. § 4314; 31 C.F.R. § 1010.350(a). The reporting requirement applies for any year in which the maximum aggregate balance of all the foreign financial accounts exceeds $10,000 at any time during the calendar year.

The regulation's definition of a "United States person" includes "[a] resident of the United States" which is defined as "an individual who is a resident alien under 26 U.S.C. [("Internal Revenue Code" or "I.R.C.")] 7701(b) and the regulations thereunder . . . ." 31 C.F.R. § 1010.350(b)(2). In turn, I.R.C. § 7701(b)(1)(A) states:

> **(A) Resident alien.**—An alien individual shall be treated as a resident of the United States with respect to any calendar year if (and only if) such individual meets the requirements of clause (i), (ii), or (iii):
>
> **(i) Lawfully admitted for permanent residence.**—Such individual is a lawful permanent resident of the United States at any time during such calendar year.

Additionally, I.R.C. § 7701(b)(6) further articulates:

> **(6) Lawful permanent resident.**—For purposes of this subsection, an individual is a lawful permanent of the United States at any time if—
>
> (A) such individual has the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, and

>   (B) such status has not been revoked (and has not been administratively or judicially determined to have been abandoned).
>
>   An individual shall cease to be treated as a lawful permanent resident of the United States if such individual commences to be treated as a resident of a foreign country under the provisions of a tax treaty between the United States and the foreign country, does not waive the benefits of such treaty applicable to residents of the foreign country, and notifies the Secretary of the commencement of such treatment.

Thus, any person allowed to permanently reside in the United States by virtue of U.S. immigration laws must file an FBAR unless that person is entitled to be treated as a resident of a foreign country under a tax treaty. Stated more succinctly by Magistrate Judge Karen S. Crawford in this case, the statutory and regulatory framework applicable to this action, in which tax treaties provide a potential escape hatch that excuses certain "United States persons" from filing FBARs, can be expressed as a 5-step process:

>   (1) Under 26 U.S.C. § 7701(b)(6), anyone allowed to permanently reside within the United States by virtue of U.S. immigration laws is a "lawful permanent resident" for tax purposes unless an applicable tax treaty allows that person to be treated as a resident of a foreign country for tax purposes only;
>
>   (2) Under 26 U.S.C. § 7701(b)(1)(A)(i), any "lawful permanent resident" is a "resident alien";
>
>   (3) Under 31 C.F.R. § 1010.350(b)(2), any "resident alien" is a "resident of the United States";
>
>   (4) Under 31 C.F.R. § 1010.350(b), Any "resident of the United States" is a "United States person" required to file an FBAR;
>
>   (5) Therefore, any person allowed to permanently reside in the United States by virtue of US immigration laws must file an FBAR unless that person is entitled to be treated as a resident of a foreign country under a tax treaty.

(Doc. No. 42 at 6–7.)

First, it is undisputed that Aroeste obtained lawful permanent status in the form of a "green card" prior to the years at issue, and this status was never administratively or judicially revoked for the years at issue. Thus, Aroeste was a lawful permanent resident under I.R.C. § 7701(b)(6), a resident alien under I.R.C. § 7701(b)(1)(A)(i), and a United States person under 31 C.F.R. § 1010.350(b)(2). *See Topsnik v. C.I.R.*, 143 T.C. 240, 255 (2014) (holding the petitioner was a lawful permanent resident despite selling his U.S. home and moving to Germany, because he did not formally renounce or abandon his LPR status); *see, e.g., Walby v. United States*, 144 Fed. Cl. 1, 9 (2019) ( "A noncitizen is treated as a resident [for tax purposes] with respect to a particular calendar year in three circumstances: (1) obtaining lawful permanent residence at any time during the year, (2) meeting the 'substantial presence' test, or (3) making a first-year election. I.R.C. § 7701(b)(1)(A). A person is treated as a 'nonresident alien' only if she is neither a citizen nor treated as a resident. *Id.* § 7701(b)(1)(B).")

In his motion for summary judgment, Aroeste analyzes the "Tie-Breaker Test" under Article 4 of the Treaty, similar to the "substantial presence" test under I.R.C. § 7701(b)(1)(a)(ii) to determine whether he is entitled to be treated as a resident of Mexico under the Treaty. (*See* Doc. No. 70-1 at 8–16.) However, the Government asserts, and the Court agrees, that before reaching the "Tie-Breaker Test," the Court must first determine whether Aroeste has met the full requirements of I.R.C. § 7701(b)(6), including whether he "does not waive the benefits of such treaty applicable to residents of the foreign country, and notifie[d] the Secretary of the commencement of such treatment." (Doc. No. 76-1 at 3 (citing § 7701(b)(6)).)

### B.   Whether Aroeste Did Not Waive the Benefits of the Treaty Applicable to Residents of Mexico and Notified the Secretary of Commencement of Such Treatment

To establish Mexican residency under the Treaty, and thus avoid the reporting requirements of "United States persons," Aroeste must have filed a timely income tax return as a non-resident (Form 1040NR) with a Form 8833, Treaty-Based Return Position

Disclosure Under Section 6114 or 7701(b). Indeed, Aroeste did not submit Form 8833 to notify the IRS of his desired treaty position for the years 2012 and 2013 until October 12, 2016, when he submitted an amended tax return for both years at issue. (*Id.*) The Government asserts that because Aroeste did not timely submit these forms, he cannot establish that he notified the IRS of his desire to be treated solely as a resident of Mexico and not waive the benefits of the Treaty. (*Id.* at 4.) The Government relies upon *United States v. Little*, 828 Fed. App'x 34 (2d Cir. 2020) ("*Little II*"), a criminal appeal in which the court held a lawful permanent resident of a foreign country was a "'resident alien' or 'person subject to the jurisdiction of the United States' with an obligation to file an FBAR." *Id.* at 38 (quoting 31 C.F.R. § 1010.350(a), (b)(2)).

In response, Aroeste asserts that while he agrees with the Government that I.R.C. § 6114 requires disclosure of a treaty position, he disagrees as to the consequences for a taxpayer's failure to timely file the disclosure. (Doc. No. 75-1 at 6.) While the Government asserts the failure to timely file Forms 1040NR and 8833 deprives individuals of the Treaty benefits provided, Aroeste argues instead that I.R.C. § 6712 provides explicit consequences for failure to comply with § 6114. Specifically, § 6712 states that "[i]f a taxpayer fails to meet the requirements of section 6114, there is hereby imposed a penalty equal to $1,000 . . . on each such failure." I.R.C. § 6712(a). Based on the foregoing, Aroeste argues the taxpayer does not lose the benefits or application of the treaty law.[1] (Doc. No. 75-1 at 6.)

In *United States v. Little*, 12-cr-647 (PKC), 2017 WL 1743837, at *5 (S.D. N.Y.

---

[1] Aroeste further asserts that published agency guidance, letter rulings, and technical advice support his position. (Doc. No. 75-1 at 7.) For example, in 2007, an IRS agent sought advice from IRS Counsel asking, "Do we have legal authority to deny a tax treaty because Form 8833 is not attached or the treaty is claimed on the wrong Form (1040EZ or 1040)?" Legal Advice Issued to Program Managers During 2007 Document Number 2007-01188, IRS. IRS Counsel responded, "No, you cannot deny treaty benefits if the taxpayer is entitled to them. You may impose a penalty of $1,000 under section 6712 of the Code on an individual who is obligated to file and does not." *Id.* As to this, the Court finds it has no precedential value under I.R.C. § 6110(k)(3), which states that "a written determination may not be used or cited as precedent." *See Amtel, Inc. v. United States*, 31 Fed. Cl. 598, 602 (1994) ("The [Internal Revenue] Code specifically precludes [plaintiff] and the court from using or citing a technical advice memorandum as precedent.")

May 3, 2017) ("*Little I*"), a criminal case for the plaintiff's willful failure to file tax returns, the court stated the plaintiff's same argument "that the failure to take a Treaty position can result only in a financial penalty also lacks merit. 26 U.S.C. § 6712(c) expressly states that '[t]he penalty imposed by this section shall be *in addition to any other penalty imposed by law*.'" (emphasis added). However, in *Little I*, the plaintiff never attempted to take a treaty position. Next, in *Shnier v. United States*, 151 Fed. Cl. 1, 21 (2020), the court denied the plaintiffs' claims for relief based on tax treaties because they failed to disclose a treaty-based position on their tax returns pursuant to I.R.C. § 6114 "and did not attempt to cure this omission in their briefing[.]" Although the plaintiffs in *Shnier* were naturalized U.S. citizens who attempted to recover their income taxes under I.R.C § 1297, the court's brief discussion of I.R.C. § 6114 in relation to a treaty-based position is instructive that an untimely notice of a treaty position does not bar the individual from taking such position. Moreover, in *Pekar v. C.I.R.*, 113 T.C. 158 (1999), the court noted that a taxpayer who fails to disclose a treaty-based position as required by § 6114 is subject to the $1,000 penalty, but stated "there is no indication that this failure estops a taxpayer from taking such a position." *Id.* at 161 n.5.[2]

The Court agrees with Aroeste. Although Aroeste gave untimely notice of his treaty position, the Court finds this does not waive the benefits of the Treaty as asserted by the Government. Rather, I.R.C. § 6712 provides the consequences for failure to comply with I.R.C. § 6114, namely a penalty of $1,000 for each failure to meet § 6114's requirements of disclosing a treaty position.

Lastly, Aroeste argues that under 26 C.F.R. § 301.6114-1(c)(2), he was not required to file Form 8833 for 2012 and 2013. (Doc. No. 75-1 at 9.) Section 301.6114-1(c)(2)

---

[2] The Government argues this case, and the others relied upon by Aroeste, are inapplicable as to FBAR filing requirements as the cases pertain to claims for treaty benefits with respect to *income tax*. (Doc. No. 79-1 at 6.) However, because 31 C.F.R. § 1010.350(b), which governs FBARs, specifically looks to I.R.C. § 7701(b) for its definition of a resident alien, and § 7701(b)(6) governs the disclosure of a treaty-based position, including as required by § 6114, the Court does not find persuasive the argument that the cases discussed by Aroeste are inapplicable, particularly in light of any case law stating otherwise.

exempts taxpayers from reporting treaty-based return positions if "their residency is determined under a treaty and apart from the Internal Revenue Code" and the reportable income does not exceed $100,000. § 301.6114-1(b)(8), (c)(2). The Government responds that Aroeste's reliance on this statute is inapplicable because it fails to address the cessation of lawful permanent resident status under § 7701(b) and is therefore irrelevant to whether Aroeste was a U.S. person for FBAR purposes. The Court agrees. Section 301.6114-1 pertains to when a taxpayer takes a treaty-based return position for a reduction of tax, and does not mention FBARs. As such, the Court finds Aroeste's argument unpersuasive.

### C. Whether Aroeste Was Required to File Form 8854

The Government next argues that even if the IRS *had* accepted Aroeste's amended returns, neither amended return would have properly notified the IRS of a commencement of treaty benefits because both failed to attach Form 8854, as required by IRS Notice 2009-85. (Doc. No. 76-1 at 4–5.) The Government concedes Aroeste attached Form 8833 to both amended forms. (*Id.*)

Aroeste responds that Notice 2009-85 is not binding authority as it fails to comply with the Administrative Procedures Act ("APA"). (Doc. No. 78-1 at 8 (citing *Green Valley Investors, LLC v. Comm'r of Internal Revenue*, 159 T.C. No. 5, at *4 (Nov. 9, 2022)) (under the APA, agencies must follow a three-step procedure for "notice-and-comment" rulemaking, but this requirement does not apply to "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice.").) The Court agrees. In *Mann Construction, Inc. v. United States*, 27 F.4th 1138 (6th Cir. 2022), the court found that Notice 2007-83 failed to comply with the APA's notice-and-comment procedure. Similarly here, because Notice 2009-85 has not been subject to a notice-and-comment procedure, it does not comply with the APA and thus is not binding. As such, Aroeste was not required to file Form 8854 with his amended returns.

### D. Aroeste's Residence

#### 1. The Treaty's Article 4 Tie-Breaker Test

Because the Court determines Aroeste has satisfied the requirements of I.R.C.

§ 7701(b)(6), Aroeste must show he was a Mexican resident on the basis of the Treaty.

Article 4 of the U.S. – Mexico Tax Treaty states that if

> an individual is a resident of both Contracting States, then his residence shall be determined as follows:
>
> a) he shall be deemed to be a resident of the State in which he has a permanent home available to him; if he has a permanent home available to him in both Contracting States, he shall be deemed to be a resident of the State with which his personal and economic relations are closer (center of vital interests);
>
> b) if the State in which he has his center of vital interests cannot be determined, or if he does not have a permanent home available to him in either State, he shall be deemed to be a resident of the State in which he has an habitual abode;
>
> c) if he has an habitual abode in both States or in neither of them, he shall be deemed to be a resident of the State of which he is a national;
>
> d) in any other case, the competent authorities of the Contracting States shall settle the question by mutual agreement.

Treaty, art. 4, ¶ 2.

Because Aroeste "is a resident of both Contracting States," the Court must determine his residence. First, the Court must determine where Aroeste has a permanent home available to him. The commentary related to the Model Treaty drafted by the Organization for Economic Cooperation and Development ("OECD") defines a permanent home as one where "the individual has arranged to have the dwelling available to him at all times continuously, and not occasionally for the purpose of a stay which, owing to the reasons for it, is necessarily of short duration (travel for pleasure, business travel, educational travel, attending a course at school, etc.)." OECD, Commentaries on the Articles of the Model Tax Convention 87 (2010).

Here, Aroeste has homes in both the United States and Mexico. All three homes have always been available to him. However, Aroeste asserts his home in Mexico City is his "permanent home" because his physician, dentist, family, friends, and the majority of his

personal items are in Mexico City, where he spends the majority of his time. (Doc. No. 70-1 at 12.) Anything mailed to his Florida condominium is forwarded to his Mexico City residence by a company hired by Aroeste called Miramar Services, which also paid certain bills on Aroeste's behalf. (*Id.* at 12–13.) Miramar describes itself as "a bill paying service for foreign nationals who generally live outside the U.S. but who maintain vacation home/second home in the States for a monthly fee, Miramar Services pays these bills as directed by client. Miramar also picks up or receives mail addressed to the client at their address and forwards such mail to the client or holds mail until the client returns to the States and picks up the mail in person." (*Id.* at 12; Stip. ¶ 35.) Moreover, Aroeste asserts the condominium in Florida and country house in Morelos, Mexico, are used for short durations and are owned solely for vacation, always during the holidays. (Doc. No. 70-1 at 12.)

Next, if Aroeste is found to have a permanent home in both Contracting States, the Court must then determine his "center of vital interests." The OECD Commentary explains:

> [R]egard will be had to his family and social relations, his occupations, his political, cultural or other activities, his place of business, the place from which he administers his property, etc. The circumstances must be examined as a whole, but it is nevertheless obvious that considerations based on the personal acts of the individual must receive special attention. If a person who has a home in one State sets up a second in the other State while retaining the first, the fact that he retains the first in the environment where he has always lived, where he has worked, and where he has his family and possessions, can, together with other elements, go to demonstrate that he has retained his centre of vital interests in the first State.

OECD, *supra*, at 87. Here, Aroeste and his wife live in Mexico, he is a member of social organizations in Mexico, most of his friends are in Mexico, he votes in Mexico, his cars and personal belongings are in Mexico, as well as his doctors and dentist, his health insurance and cell phone carrier are in Mexico, and he receives all his mail in Mexico. (Doc. No. 70-1 at 13–14.) Moreover, the IRS audit's independent analysis of Aroeste's relative presence in Mexico and the United States show that he spent over 75% of his days

during the years at issue in Mexico. (*Id.* at 14.)

Based on the foregoing, the Court finds Aroeste's residence is in Mexico.

### 2. Whether a Dual Resident Is Treated as a United States Resident

The Government does not dispute Aroeste's argument under the Treaty's tie-breaker test. (*See* Doc. No. 76-1 at 5.) Rather, the Government argues Aroeste could have claimed to be treated as a Mexican resident under the Treaty, but that this would not have helped him because a dual resident who claims a treaty benefit is still treated as a United States resident under I.R.C. § 7701(b), and thus still required to make FBAR filings. (*Id.*; Doc. No. 79-1 at 3.) In support, the Government points to the preamble to the 31 C.F.R. Part 1010 regulations, providing that "[a] legal permanent resident who elects under a tax treaty to be treated as a non-resident for tax purposes must still file the FBAR." Amendment to the Bank Secrecy Act Regulations—Reports of Foreign Financial Accounts, 76 Fed. Reg. 10234-01 (Feb. 24, 2011).

The Court finds this unavailing. The Government's argument does not refute the plain language of the FBAR regulations, which explicitly invoke provisions of Title 26, including the provision that requires consideration of an individual's status under an applicable tax treaty for the purpose of determining whether an individual is a "United States person" subject to FBAR filing. Specifically, Title 31 C.F.R. § 1010.350, which governs reporting of FBARs, subsection (b)(2) states that a "resident of the United States is an individual who is a resident alien under 26 U.S.C. 7701(b) and the regulations thereunder . . . ." The Government fails to cite to any case law or statue indicating otherwise, and the Court finds none. As such, because the Court finds the Treaty applicable to Aroeste, then the residence provisions of the Treaty, or the "tie breaker rules" dictates whether Aroeste may be treated as a nonresident alien.

### E. Whether the IRS Timely Assessed "Failure to File" Penalties

Lastly, Aroeste argues the IRS did not timely assess "failure to file" penalties. (Doc. No. 78-1 at 4.) Rather, the IRS assessed penalties for an alleged failure to meet recordkeeping requirements under 31 U.S.C. §§ 5314(a) and 5321 for 2012, and penalties

under 31 U.S.C. § 5321(a)(6) relating to financial institutions and nonfinancial trade or businesses for 2013. (*Id.*) Thus, asserts Aroeste, the Government's motion for summary judgment must be denied because it has failed to show a valid assessment for the failure-to-file penalty or facts supporting the other penalties that actually were assessed. (*Id.* at 5.)

In its sur-reply, the Government responds that the mistakes in Forms 13448, Penalty Assessment Certification (Title 31 – "FBAR"), for 2012 and 2013 are not dispositive and that incorrect penalty descriptions in penalty assessment certification forms do not preclude granting the Government's motion. (Doc. No. 83-1 at 2.)

First, Aroeste has acknowledged throughout this litigation that the penalties at issue are for the alleged failures to file FBARs. (Doc. No. 83-1 at 2.) For example, although the United States Tax Court does not have jurisdiction over Title 31 penalties such as for failure to file FBARs, Aroeste stated in his Tax Court petition that the Commissioner assessed non-willful FBAR penalties under Title 31 related to his Mexican bank accounts. (*Id.*) Moreover, Aroeste's Complaint discusses the nature of the assessed FBAR penalties, as well as the disputed calculation of the assessed penalties. (*See generally* Complaint, Doc. No. 1.) Rather, this is Aroeste's first time during this litigation raising this issue. (*See generally* Docket.) In Aroeste's Answer to the Government's counterclaim, his affirmative defenses pertain to non-willful FBAR penalties and do not raise either the timeliness of the "failure to file" penalties or the mistakes in Forms 13448 for 2012 and 2013. (*See* Doc. No. 22 ¶¶ 121–24.) As such, the Court finds this argument unavailing.

Next, the Government asserts that "Form 13448 is an internal document prepared by the IRS to certify that an FBAR penalty was *assessed* on a certain date." (Doc. No. 83-1 at 4 (citing I.R.M. 8.11.6.6(4)(n).) The Government argues that while Form 13448 certifies FBAR penalty assessments, such assessments need not be demonstrated solely through the form because the entire administrative record can be used to describe the FBAR penalty assessments. (*Id.* at 4–5.) As demonstrated by the Government, "[t]he process for the assessment of an FBAR penalty begins when [the IRS] receives a Form 13449[.]" (Declaration of FBAR Penalty Coordinator Onisha Y. Darnell ("Darnell Decl."), Doc. No.

83-3, ¶ 3.) Although Form 13449 contains seven different types of FBAR penalties, the IRS FBAR Database has no option to select a non-willful reporting violation under § 5321(a)(5), as recorded in Aroeste's case. (*Id.* ¶¶ 4, 5.) "[W]hen the Form 13449 reflects a proposed FBAR penalty for a non-willful reporting violation, [the IRS] typically enter[s] that into the IRS FBAR Database as a non-willful *recordkeeping* violation. This is what was done for Alberto Aroeste's 2012 liability." (*Id.* ¶ 6.) For 2013, "[f]or unknown reasons, 'Negligent Failure to Report – 31 USC 5321(a)(b)' was selected as the proposed penalty against Alberto Aroeste . . . . This does not match what was stated as the proposed FBAR penalty on the Form 13449. It should have been entered just as the penalty was entered for 2012." (*Id.* ¶ 7.) Despite this database programming flaw and the inaccurate penalty descriptions, the Government asserts this should not negate the IRS's ability to assess and collect non-willful reporting FBAR penalties. (Doc. No. 83-1 at 5.)

The Government further notes the IRS' intent has always been to assess FBAR penalties against Aroeste, as consistent with its investigation and collected documents about potential FBAR penalties. (*Id.* at 6.) Moreover, the administrative file solely references non-willful FBAR reporting penalties for Aroeste. (*Id.*) The Government asserts that if the database programming inaccuracies were taken literally, it would lead to an absurd result. (*Id.* at 7 (citing *Holy Trinity Church v. United States*, 143 U.S. 457, 459–60 (1892)).)

The Court agrees. In *United States v. Duron*, 21 F.3d 1116, 1994 WL 123873 (9th Cir. 1994), the court was presented with a statute that failed to provide a penalty for a weapons charge violation. The court found that, based on the statute's legislative history, "the erroneous textual reference to a nonexistent subpart was merely a typographical error" and thus held that no issue existed as to whether a penalty could be imposed because the statute intended to provide such penalties. *Id.* at *3–4. Although *Duron* addressed an error within a statute, here the IRS clearly intended to assert non-willful FBAR reporting penalties against Aroeste. As such, the Court finds the inconsistencies within Forms 13448 for 2012 and 2013 to be attributable to database programming flaws and a scrivener's error.

## IV. CONCLUSION

Based on the foregoing, the Court **DENIES** the Government's motion for summary judgment and **GRANTS IN PART AND DENIES IN PART** Aroeste's motion for summary judgment.

Specifically, the Court finds Aroeste is a United States person, but ceased to be treated as a lawful permanent resident of the United States because he commenced to be treated as a resident of Mexico under the Treaty, did not waive the benefits of such Treaty, and notified the Secretary of the commencement of such treatment. Thus, Aroeste is not subject to FBAR penalties. The Government must discharge Aroeste's liability for penalties still outstanding for the non-filing of a FBAR for the years 2012 and 2013 pursuant to 31 U.S.C. § 5321, totaling $21,851.76, and must refund Aroeste's payment of $3,004.

The Court further finds Aroeste untimely notified the Secretary of the commencement of treatment as a resident of Mexico, and thus is subject to penalties pursuant to I.R.C. § 6712(a) equal to $1,000 per failure to timely report his Treaty position, totaling $2,000 for 2012 and 2013. The Government may proceed accordingly in this later regard.

The Court **ORDERS** the Clerk of Court to **CLOSE THIS CASE**.

**IT IS SO ORDERED.**

Dated: November 20, 2023

Hon. Anthony J. Battaglia
United States District Judge